## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| KELLY BLACKMON, | * | |
| | * | |
| Plaintiff, | * | |
| | * | Civil Action No. 22-cv-01185-PX |
| v. | * | |
| | * | |
| CAROL SPAHN, | * | |
| | * | |
| Defendant. | * | |
| | * | |

\*\*\*

### <u>MEMORANDUM OPINION</u>

Plaintiff Kelly Blackmon has sued the Peace Corps (the "Peace Corps" or "Agency")

through its Director, Carol Spahn, for discrimination, retaliation, and hostile work environment

based on race, sex, and disability.  ECF No. 22.  The Agency moves for dismissal or summary

judgment in their favor on all claims.  ECF No. 24.  The motion is fully briefed, and no hearing

is necessary.  *See* D. Md. Loc. R. 105.6.  For the following reasons, the motion, construed as one

for summary judgment, is GRANTED.

### I.   Background[1]

In July 2019, Blackmon, a "Brown African-American/Hispanic" woman, applied to

become the Chief Administrative Officer of the Peace Corps.  ECF No. 27-2 at 4, 8.  In that role,

Blackmon would be responsible for managing budgetary and administrative issues for the

Agency, supervising a team of lower-level employees, and serving as an expert on administrative

policies.  *Id.* at 84–85.  During Blackmon's interview with her prospective Peace Corps

supervisors, Jeffrey Harrington and William Stoppel, Blackmon shared that her son has autism,

---

[1] Except where otherwise noted, the following facts are undisputed and construed most favorably to Blackmon as the non-movant.  *See The News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010); *Paulone v. City of Frederick*, 787 F. Supp. 2d 360, 364 n.3 (D. Md. 2011).

and that he requires Blackmon's help with certain daily tasks such as making sure he gets on the school bus each morning at 8:00 a.m.  *Id.* at 6–8.  Harrington and Stoppel responded that if Blackmon were hired, she could telework three days per week and report to the office at 9:30 a.m. to accommodate her son's schedule.  *Id.*

The Peace Corps offered Blackmon the position, which she accepted in large part because of the promise that she could work a flexible schedule.  *Id.* at 9.  But by the time Blackmon reported for her first day of work on October 13, 2019, Harrington and Stoppel had left the Agency.  *Id.* at 8.  Karla Wesley became Blackmon's first level supervisor and V. Clark Presnell her second level supervisor.  *Id.* at 3.  Neither approved regular telework for Blackmon.  *Id.* at 9.  Blackmon emphasized that the promise of telework had been one of the main reasons she left her previous position at the Department of Justice ("DOJ") to work at the Peace Corps.  *Id.* at 106.  In response, Presnell told Blackmon that he would support her if she wanted to "return to where [she] came from."  *Id.*[2]

According to Wesley, Blackmon was permitted to start at 9:30 a.m. to accommodate her son's school schedule, which Blackmon did most days.  ECF No. 24-2 at 24.  The Agency also let Blackmon telework on a limited basis.  Blackmon signed a "Situational Telework Schedule Agreement," and during the first 90 days, she teleworked a total of 100 hours.  *Id.* at 24, 30.

Wesley also explained to Blackmon that as a new hire, Blackmon was expected to be physically present to develop relationships with her team members.  *Id.* at 24.  However, Wesley assured Blackmon that after her 90-day probationary period expired, a permanent telework schedule could be implemented.  *Id.*

Blackmon highlights that during the same time period, three white men in the Agency—

---

[2] Elsewhere in the record, Blackmon notes that Presnell's comments caused her to believe that he "didn't want me" at the Agency.  ECF No. 27-2 at 10.

Timothy Hower, Joey O'Farrell, and Jim Pimpedly—and one black man—Timothy Kelly—had

been granted more liberal telework arrangements.  ECF No. 24-3 at 18.  O'Farrell, Chief of

Travel and Transportation Services, was permitted to telework two workdays per week.  ECF

No. 27-2 at 18, 120–21.  OSHA expert Timothy Hower was permitted to work 100% remotely

from Oregon.  *Id.* at 19.  Timothy Kelly, an expert and senior advisor, teleworked two days per

week.  *Id.* at 127–28.  And Jim Pimpedly, an expert consultant, was permitted "intermittent"

telework.  *Id.* at 129–30.

In total, Blackmon worked at the Agency for about three months.  During that time,

Blackmon recalls only occasionally being allowed to report to the office after 8:00 am.  *Id.* at 6.

Also, she missed important school evaluations because she had to work during evening hours.

*Id.*  Blackmon's sick leave had also been carefully monitored; Wesley required Blackmon to

provide written proof of doctor's appointments and, on one occasion, scolded Blackmon for

using annual leave for sick days after she had used her allotted sick leave.  *Id.* at 15.

Blackmon also complains that Wesley and Presnell were less than model supervisors.

They refused to give her input on her performance.  *Id.* at 11, 108.  They also described a white

male employee, Tom Geraghty, as "great" and Blackmon as "just okay."  ECF No. 24-2 at 2.

Blackmon further accuses Wesley of trying to take Blackmon's "personal property,"

although Blackmon provides no specifics.  ECF No. 27-2 at 12.  Wesley, according to Blackmon,

also excluded her from meetings and canceled her welcome lunch without explanation.  *Id.*  On

one occasion, Wesley made Blackmon wear a suit to a meeting even though Blackmon had also

been told by a human resources specialist that the Agency does not have a dress code.  *Id.* at 11–

12.  Wesley also denied Blackmon's request to attend a 10-hour training course because

Blackmon had not been in her position long enough.   ECF Nos. 24-2 at 3; 27-2 at 109.  Last,

3

Blackmon complains that Wesley told her that since her arrival, the office was "pretty diverse." ECF No. 27-2 at 11.

On January 22, 2020, Blackmon received an offer of reinstatement from DOJ. *Id.* at 10. The next day, she notified human resources that she would be returning to DOJ and gave her formal resignation notice to Presnell and Wesley on January 24, 2020. ECF No. 24-2 at 25. On January 28, 2020, Blackmon informally contacted the Equal Employment Opportunity Commission ("EEOC") for counseling as to whether she had been the victim of discrimination or harassment. *Id.* at 6.

Shortly after, on February 5, Blackmon was hospitalized with a "strained heart." ECF No. 27-2 at 15. Blackmon's doctor told her that the condition likely resulted from stress. *Id.* Blackmon shared this information with the Agency on February 10 and her last day was February 15, 2020. *Id.* at 5; ECF No. 24-2 at 25.

On February 25, 2020, Blackmon, Wesley, and Presnell engaged in Alternative Dispute Resolution Mediation regarding Blackmon's discrimination allegations. ECF No. 24-2 at 7. When mediation failed, Blackmon filed a formal complaint with the Peace Corps' EEOC office on March 11, 2020. *Id.* at 7–8. The Agency proceeded to investigate the matter.

On June 19, 2020, Blackmon received from the Agency the EEOC Report of Investigation. ECF No. 19-2. The Letter accompanying the Report ("June 19 Letter") specifically told Blackmon that the Final Agency Decision ("FAD") will follow within 45 days and that at such time, Blackmon "will be advised of her rights to appeal if applicable." *Id.* The Letter concluded, "Please note that [Blackmon] retains her rights to appeal the claim to the MSPB [Merit Systems Protection Board] if a final decision is not issued within 120 days of the date of filing this mixed case complaint at any time thereafter, as specified in 5 C.F.R. §§

4

1201.154(a) & (b), or may file a civil action as specified in 29 C.F.R. § 1614.310(g), but not both." *Id.*

As to Blackmon's right to appeal her claim to the MSPB, this advisement was wrong. Because Blackmon was a foreign service employee, the MSPB lacked jurisdiction over her complaint. *See* ECF No. 24-4 at 4–5 (citing 5 U.S.C. § 7511(b)(6)). Thus, unbeknownst to her, any attempts to appeal to the MSPB would be a dead letter.

On July 31, 2020, the Agency issued its Final Agency Decision ("FAD") in the Agency's favor. ECF No. 24-3 at 29. The FAD stated that Blackmon could appeal her decision to the EEOC Office of Federal Operations ("OFO") within 30 days or file a complaint in the proper United States District Court within 90 days. *Id.* at 29–30. The FAD made no mention of appealing to the MSPB.

On August 12, 2020, Blackmon appealed the FAD to the MSPB. ECF No. 24-4 at 2. On October 5, the MSPB dismissed the appeal for lack of jurisdiction. *Id.* at 5. The MSPB also informed Blackmon that she could next either file suit in federal court, or appeal the decision to the OFO, and that she must exercise either option 30 days after the MSPB decision became final. *Id.* at 10–11.

Blackmon next noted her appeal with the OFO. ECF No. 24-5. The OFO, in turn dismissed the appeal as untimely. ECF No. 24-6. The OFO measured the time for Blackmon to appeal from the date of the FAD—July 31, 2020. *Id.* at 2. Thus, according to the OFO, Blackmon had to note her appeal by no later than August 31. *Id.*

Blackmon next filed suit in this Court on May 17, 2022, and thereafter amended her complaint. ECF Nos. 1, 22. The Amended Complaint brings claims of race, color, and sex-based discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

("Title VII") (Count I), disability discrimination under the Rehabilitation Act of 1973, 29 U.S.C.

§ 701, *et seq.* ("Rehabilitation Act") (Count II), retaliation under the Rehabilitation Act (Count

III), and hostile work environment under Title VII and the Rehabilitation Act (Count IV).  ECF

No. 22 at 14–20.  The Agency now moves to dismiss the Amended Complaint for lack of subject

matter jurisdiction under Rule 12(b)(1).  It also moves for dismissal for failure to state a claim

under Rule 12(b)(6), or in the alternative for summary judgment.  ECF No. 24.

     As for the "jurisdictional" argument, the Agency wrongly asserts that this Court lacks

jurisdiction because Blackmon failed to exhaust administrative remedies.  ECF No. 24-1 at 10.

The Agency fundamentally misconstrues lack of exhaustion as jurisdictional; it is not.  *See Fort*

*Bend Cnty. v. Davis*, 139 S. Ct. 1843, 1851 (2019) ("Title VII's charge-filing requirement is a

processing rule, albeit a mandatory one, not a jurisdictional prescription delineating the

adjudicatory authority of courts."); *Prosa v. Austin*, No. ELH-20-3015, 2022 WL 394465, at *15

(D. Md. Feb. 8, 2022) (applying *Fort Bend* to Rehabilitation Act claim).  Thus, all arguments

must be viewed through the standards set forth in Rule 12(b)(6) or, if the motion is construed as

one for summary judgment, Rule 56.

## II.    Standard of Review

     Where, as here, the movant seeks dismissal or alternatively summary judgment, the Court

retains wide latitude to construe the motion as one for summary judgment.  Federal Rule of Civil

Procedure 12(d) advises that where "matters outside the pleadings are presented to and not

excluded by the court, the motion must be treated as one for summary judgment under Rule 56."

Fed. R. Civ. P. 12(d).  The Court, however, may accept or reject any material beyond the

pleadings "offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting

the motion, or [] reject it or simply not consider it."  *Wells-Bey v. Kopp*, No. ELH-12-2319, 2013

WL 1700927, at *5 (D. Md. Apr. 16, 2013) (quotations omitted).

The nonmovant may oppose converting a motion to dismiss into one for summary judgment by filing an affidavit or declaration that complies with the requirements of Rule 56(d). *See Hamilton v. Mayor and City Council of Balt.*, 807 F. Supp. 2d 331, 341 (D. Md. 2011) (citing Fed. R. Civ. P. 56(d)).  Specifically, Rule 56(d) requires, at a minimum, that the non-movant "adequately inform[] the district court that the motion is pre-mature and that more discovery is necessary."  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (2002) (quotations omitted).  But in no circumstance may the nonmovant "simply demand discovery for the sake of discovery."  *Hamilton*, 807 F. Supp. 2d at 342 (quotations omitted); *see also Harrods*, 302 F.3d at 244 (mere reference to "the need for additional discovery . . . is not an adequate substitute" for a Rule 56(d) affidavit).

In connection with the motion, the Agency and Blackmon submit evidence beyond the four corners of the Amended Complaint.  *See* ECF Nos. 24-2; 27-2.  Blackmon also has not submitted a Rule 56(d) affidavit or otherwise argued that any additional evidence is needed for the Court to adjudicate the motion; rather, she obliquely asserts that summary judgment is "premature" because she needs to "gather additional evidence."  ECF No. 27-1 at 15.  The Court is unconvinced that additional discovery "would reveal triable issues of fact."  *Agelli v. Sebelius*, No. DKC 13-497, 2014 WL 347630, at *9 (D. Md. Jan. 30, 2014) (quoting *McWay v. LaHood*, 269 F.R.D. 35, 38 (D.D.C. 2010)).  Thus, the Court will treat the motion as one for summary judgment.

Summary judgment is appropriate when the Court, construing all evidence and drawing all reasonable inferences in the light most favorable to the non-moving party, finds that no genuine dispute exists as to any material fact, thereby entitling the movant to judgment as a

matter of law.  Fed. R. Civ. P. 56(a); *see In re Family Dollar FLSA Litig.*, 637 F.3d 508, 512 (4th Cir. 2011).  Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"  *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)) (alteration in original).  Genuine disputes of material fact are not created "through mere speculation or the building of one inference upon another."  *Othentec Ltd. v. Phelan*, 526 F.3d 135, 140 (4th Cir. 2008) (quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985)).

The Court turns first to the Agency's exhaustion argument.

## III.  Analysis

### A.  Exhaustion

The Agency argues that Blackmon's claims are unexhausted because she failed to file suit within 90 days, or appeal to the OFO within 30 days, after the FAD.  ECF No. 24-1 at 10.  It is undisputed that Title VII requires timely exhaustion of remedies prior to filing suit in federal court.  *Medlock v. Rumsfeld*, 336 F. Supp. 2d 452, 462 (D. Md. 2002).  Further, the pertinent regulations require that federal suit must be filed within 90 days after the EEOC issues its decision, and that a complainant must appeal to the OFO within 30 days.  29 CFR §§ 1614.402(a), 1614.407(a).  Indisputably, Blackmon missed those filing deadlines.  *See* ECF Nos. 24-3 & 24-6.  Thus, Blackmon did not timely exhaust her administrative remedies.

Nonetheless, Blackmon contends that the time to file should be equitably tolled because

she had relied to her detriment on the Agency's erroneous instruction that she retained the right

to appeal to the MSPB.  ECF No. 27-1 at 11.  At the point Blackmon learned of the Agency's

error, the time had long passed to either note her appeal to the OFO or file suit.  Thus, says

Blackmon, the doctrine of equitable tolling should apply to save the claim.  *Id.*

     "Equitable tolling is a discretionary doctrine that 'turns on the facts and circumstances

of a particular case.'"  *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 321

(4th Cir. 2011) (quoting *Harris v. Hutchinson*, 209 F.3d 325, 330 (4th Cir. 2000)).  Such tolling

is to be applied "sparingly," reserved for extraordinary situations where despite plaintiff's

exercise of diligence, circumstances beyond the plaintiff's control prevented compliance.  *Irwin*

*v. Dep't of Veterans Affs.*, 498 U.S. 89, 96 (1990); *see also Harris* 209 F.3d at 330.  Equitable

tolling is especially appropriate where defendant's acts or omissions "led to the plaintiff being

unaware of a cause of action or otherwise unable to timely file."  *Roberts v. Am. Neighborhood*

*Mort. Acceptance Co.*, No. JKB-17-0157, 2017 WL 3917011, at *5 (D. Md. Sept. 6, 2017)

(citing *Aikens v. Ingram*, 524 F. App'x 873, 879 (4th Cir. 2013)).  Similarly, "bad advice from

the governmental agency charged with enforcing discrimination complaints" can constitute a

proper basis to toll filing deadlines.  *Poteat v. Mack Trucks Inc.*, No. 96-1437, 1997 WL 33117,

at *4 (4th Cir. Jan. 28, 1997); *see also Kramer v. Bd. of Educ. of Balt. Cnty.*, 788 F. Supp. 2d

421, 426 (D. Md. 2011) (Courts "freely" invoke equitable tolling "where the plaintiff's delay in

filing was the result of misleading conduct or misinformation by a government agency.").

     The record, without question, reflects that the Agency's wrong advice caused Blackmon

to miss her time to appeal the FAD to the OFO, or file timely suit in this Court.  The June 19

Letter stated that Blackmon could "appeal the claim to the MSPB if a final decision is not issued

within 120 days of the date of filing this mixed case complaint at any time thereafter."  ECF No.

19-2 at 1–2 (citing 5 C.F.R. § 1201.154).  Notably, Blackmon did not receive her final decision until July 31, 2020, 142 days after she first pursued her claims with the EEOC.  ECF No. 24-3. Thus, according to Blackmon, her decision to appeal to the MSPB, and all subsequent filings, were reasonably based on the instructions in the June 19 Letter.

The Agency, in response, highlights that the June 19 Letter also told her the FAD would provide additional information on appeal rights, and these instructions superseded any previous erroneous advisement.  ECF No. 24-1 at 12.  But in fairness to Blackmon, the FAD is silent on the MSPB, and so the FAD notice could be read to supplement, not supplant, the previous advisement.  ECF No. 24-3.  Thus, on this record, the Court concludes that the Agency's error invited Blackmon to appeal to the MSPB—which she did, and which in turn led to her untimely filing of this action.

The record also reflects that the delay in filing had been no fault of Blackmon's.  By the plain reading of the June 19 Letter, Blackmon's appeal to the MSPB was entirely proper.  ECF No. 19-2.  As was her appeal to the OFO, according to the MSPB decision.  ECF No. 24-4 at 10–11.  In short, Blackmon did not delay in pursuing every level of review based on the Agency's erroneous instruction.

Ultimately, "Title VII plaintiffs should be able to rely on the instructions provided by their agency-employer when that agency takes employment action against them." *Kotzalas v. Svinicki*, No. 20-2926-PWG, 2022 WL 1002136, at *4 (D. Md. Mar. 31, 2022).  And the Agency "should not benefit from its failure to provide its employees with clear instructions regarding their rights to appeal adverse agency decisions." *Id.* (granting equitable tolling where the Agency's misleading instructions caused a plaintiff to miss a filing deadline).  Because Blackmon diligently followed patently wrong filing instructions, fairness dictates that the Court

reach the merits of her claims.

### B.   Title VII Discrimination

Turning first to her discrimination claims, Blackmon alleges that the Agency had taken a series of adverse actions against her on account of her race (African American/Hispanic), color (Brown), and sex (female), in violation of Title VII.  ECF No. 22 ¶¶ 68–76.  Absent direct evidence of discrimination, the claims are subject to the well-established burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Adams v. Trs. of the Univ. of N.C.-Wilmington*, 640 F.3d 550, 558 (4th Cir. 2011).  Under this framework, the plaintiff must first make a prima facie showing that she (1) is a member of a protected class; (2) performed her job in a satisfactory manner; and (3) suffered an adverse employment action (4) in a manner that gives rise to an inference of discriminatory animus.  *See id.*  If the plaintiff makes this showing, the burden shifts to the employer to articulate a legitimate, nondiscriminatory reason for taking adverse action.  *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 253 (1981).  If the employer does so, the burden shifts back to the plaintiff to demonstrate that the stated reasons are mere pretext for discrimination.  *Id.*

As an initial matter, Blackmon offhandedly argues that the *McDonnell Douglas* framework no longer applies following the Supreme Court's decision in *Babb v. Wilkie*, 140 S. Ct. 1168 (2020).  ECF No. 27-1 at 16.  Babb, a public-sector employee who brought a claim under the Age Discrimination Employment Act, essentially challenged whether the ADEA requires proof of "but-for" discrimination in the federal sector context.  *Babb*, 140 S. Ct. at 1174.  The Supreme Court agreed with Babb that such but-for causation was not required, and remanded the matter to the Eleventh Circuit to apply the correct standard.  *Id.*  On remand, the Eleventh Circuit reasoned that a public-sector employee no longer needs to prove stated reasons

were a mere pretext for discrimination under *McDonnell Douglas*, and instead proof that age had

been a motivating factor would be enough to sustain the claim. *Babb v. Sec'y, Dep't of Veterans

Affs.*, 992 F.3d 1193, 1204 (11th Cir. 2021).

Notably, the Eleventh Circuit has since made clear that Babb did nothing to upset the

other *McDonnell Douglas* factors, namely a plaintiff's initial prima facie showing. *See Lewis v.

Sec'y of U.S. Air Force*, No. 20-12463, 2022 WL 2377164, at *10 (11th Cir. June 30, 2022).

Nor has the Fourth Circuit decided the implications of *Babb* on the *McDonnell Douglas*

framework. *See, e.g., Kitlinski v. U.S. Dep't of Just.*, 994 F.3d 224, 232 n. 7 (4th Cir. 2021)

("We need not decide Babb's applicability in the Title VII context here.").  Courts in this district

and elsewhere also continue to apply *McDonnell Douglas* as unchanged since *Babb*.  *See Ryan v.

Wolf*, No. ELH-19-1968, 2021 WL 409747, at *15 (D. Md. Feb. 5, 2021) (noting that even

though Babb lowered the causation threshold for ADEA retaliation claims, *McDonnell Douglas*

still applies); *Patterson v. Comm'r of Soc. Sec.*, 834 F. App'x 737, 738–39 (3rd Cir. 2021);

*Wallace v. Wormuth*, No. 18-6525-RA, 2022 WL 993064, at *17 (S.D.N.Y. Mar. 31, 2022).

Because Blackmon has given this Court no reason to stray from the application of

*McDonnell Douglas,* this Court will analyze the claim under this framework.  And even if this

Court followed the Eleventh Circuit, it would make little difference because, as discussed below,

Blackmon cannot make the prima facie showing at the outset.

The Agency principally argues that because no evidence demonstrates Blackmon suffered

an adverse employment action under circumstances giving rise to an inference of discrimination,

Blackmon cannot make the prima facie showing.  ECF No. 24-1 at 18.  For an employment

action to be sufficiently "adverse," the plaintiff must generate some evidence that the action

detrimentally affected "the terms, conditions, or benefits of the plaintiff's employment." *James*

*v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 375 (4th Cir. 2004) (internal quotations and brackets omitted).  Such adverse actions include "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion." *Boone v. Goldin*, 178 F.3d 253, 255 (4th Cir. 1999).

Blackmon argues that the Agency's denial of her telework request was sufficiently adverse to survive challenge.  ECF No. 27-1 at 19.   Notably, an employer's outright refusal to allow telework "*without more*, does not rise to the level of an adverse employment action." *Walker v. Md. Dep't of Info. and Tech.*, CCB-20-219, 2020 WL 6393435, at *3 (D. Md. Nov. 2, 2020) (emphasis added).  Unless the denial is paired with some other adverse, tangible loss of job title, responsibility, or promotion opportunities, it alone will not suffice.  *See Terry v. Purdue*, No. JKB-18-31, 2018 WL 4494883, at *5 (D. Md. Sept. 19, 2018) (denial of telework arrangement was not adverse action where plaintiff suffered no concurrent "change in compensation, job title, level of responsibility, or opportunity for promotion"); *Dailey v. Lew*, No. GLR-15-2527, 2016 WL 1558150, at *6 (D. Md. Apr. 18, 2016) (same); *cf. Boone*, 178 F.3d at 256–57 ("[A]bsent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.").

When construing the record most favorably to Blackmon, she has simply failed to make a prima facie showing of adverse action.  First, on this record, a reasonable trier of fact could not conclude that the Agency outright denied Blackmon the option of regular telework.  Rather, the Agency restricted regular telework for the first 90 days of Blackmon's employment, at which time the subject would be revisited.  ECF No. 24-2 at 24.  And even during this 90-day period,

Blackmon had been permitted to telework for *100 hours*. *Id.* From this, a reasonable factfinder would be hard pressed to conclude Blackmon had been *denied* telework.

Further, even if Blackmon had been conclusively denied the telework option, no other adverse action accompanied the denial sufficient to sustain the claim. Wesley had rejected one training request, failed to provide requested feedback, neglected to reschedule a welcome lunch, and restricted Blackmon's work attire for one meeting. ECF No. 27-2 at 11–12. Although perhaps Wesley had personally offended Blackmon, she did not otherwise alter Blackmon's employment conditions such that the claim can proceed. *See Chika v. Planning Res. Corp.*, 179 F. Supp. 2d 575, 584–85 (D. Md. 2002) (denial of training not an adverse employment action in context of discrimination claim); *Wonasue v. Univ. of Md. Alumni Ass'n*, 984 F. Supp. 2d 480, 492 (D. Md. 2013) (failure to provide performance review not an adverse employment action). Likewise, although Presnell's comment about Blackmon's return to her prior job made Blackmon feel unwanted, it had no effect on Blackmon's current responsibilities or expectations. ECF No. 27-2 at 10. Thus, because Blackmon has not adduced evidence that she sustained any legally cognizable adverse employment action, summary judgment must be granted in the Agency's favor on the race, color, and sex discrimination claims.[3]

Alternatively, no evidence suggests that Blackmon had been mistreated because of her race, color, or sex. Blackmon rests her claim on supposed "comparator" evidence. ECF No. 27-1 at 19. Comparator evidence consists of employees outside plaintiff's protected class who are otherwise "similarly situated in all relevant respects" and who receive more favorable treatment

---

[3] Blackmon also seems to suggest that she had been constructively discharged because the cumulative effect of these incidents forced her to resign. Again, no rational factfinder could conclude that the employment demands placed on her were "so intolerable that a reasonable person would resign." *U.S. E.E.O.C. v. Consol Energy, Inc.*, 860 F.3d 131, 145 (4th Cir. 2017) (quoting *Green v. Brennan*, 578 U.S. 547, 560 (2016)); *see also Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994). Thus, to the extent Blackmon pursues this theory of relief, summary judgment must be granted in the Agency's favor.

than plaintiff, in a manner giving rise to an inference of discrimination.  *See Prosa*, 2022 WL

394465, at \*26 (citing *Swaso v. Onslow Cnty. Bd. of Educ.*, 698 F. App'x 745, 748 (4th Cir.

2017)).  To be sufficiently similar, the comparators and plaintiff must have "dealt with the same

supervisor, [been] subject to the same standards and engaged in the same conduct."  *Id.* at \*28

(internal brackets, quotations, and citations omitted).

Blackmon's claimed comparators are three white male employees, as well as one black

male employee, who had been granted regular telework.  ECF No. 24-3 at 18.  One, in fact,

worked 100% remotely from Oregon.  ECF No. 27-2 at 19.  But no evidence reflects that

Blackmon and these men shared similar job responsibilities, supervisors, or even years of

service.  Rather, the record reflects each did very different work for the Agency than Blackmon.

ECF No. 24-3 at 18–19.  They had been employed at the Agency for years—not months—and

one had been restricted in telework, as was Blackmon, during his probationary employment

period.  *Id.*  Thus, even when construing the record most favorably to Blackmon, she has

adduced no evidence that the Agency treated her adversely in a manner giving rise to an

inference of discrimination.

Alternatively, even if Blackmon could make the prima facie showing, she has generated

nothing to show the Agency's stated reasons for its actions were mere pretext for discrimination.

Undoubtedly, Blackmon had been promised at her interview that she could work remotely and

have a later start to her workday.  But once she arrived, her new supervisors explained that her

physical presence was required, at least for the first 90 days, to foster good working relationships

with her team.  ECF No. 24-2 at 24.  This explanation is reasonable on its face.  Blackmon, for

her part, has not generated any evidence that the stated grounds were "inconsistent over time,

false," *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 225 (4th Cir. 2019), or "unworthy of

credence," *Burdine*, 450 U.S. at 256.   Although Blackmon takes offense at her supervisor's offhanded remarks concerning "divers[ity]," or brusque comments for her to "return to where [she] came from," ECF No. 27-2 at 10–11, these comments do not permit the inference that the Agency's stated grounds for initial denial of regular telework were a pretext for discrimination. Summary judgment, therefore, must be granted in the Agency's favor on the Title VII discrimination claims.

### C.  Rehabilitation Act Discrimination

Blackmon's disability discrimination claims rest on a slightly different footing. Blackmon avers that the Agency discriminated against her on account of her own "strained heart" condition, and because she cares for her autistic son.  ECF No. 22 ¶¶ 80–81.  For a disability discrimination claim to survive summary judgment, a plaintiff must make a prima facie case that she suffers from a disability, was qualified for her job, and suffered an adverse employment action "solely because of [her] disability." *Rock v. McHugh*, 819 F. Supp. 2d 456, 470 (D. Md. 2011) (citing *Doe v. Univ. of Md. Med. Sys. Corp.*, 50 F.3d 1261, 1265 (4th Cir. 1995)).[4]  As with Title VII discrimination claims, the burden then shifts to the employer to provide a legitimate, nondiscriminatory reason for its conduct, and then back to the plaintiff to demonstrate that the employer's rationale was pretextual.  *Hannah P v. Coats*, 916 F.3d 327, 342 (4th Cir. 2019).

With regard to her "strained heart" diagnosis, the claim fails as a matter of law because the supposed adverse employment actions all predated the disclosure of her condition to the Agency.  *See Adamczyk v. Chief, Balt. Cnty. Police Dep't*, 952 F. Supp. 259, 264 (D. Md. 1997) ("[A]n employee cannot succeed on a claim of discrimination under the ADA based on his

---

[4] The Court evaluates Rehabilitation Act claims under the same standards as those applied under the Americans with Disabilities Act ("ADA").  *See Reyazuddin v. Montgomery Cnty.*, 789 F.3d 407, 413 (4th Cir. 2015).

disability when the employer was not even aware of the employee's disability."). Blackmon resigned on January 24, purportedly on account of the Agency's adverse actions, but did not disclose her health problems until February 5. ECF No. 27-2 at 5. She left the Agency five days later. ECF No. 24-2 at 25. Thus, at the time Blackmon's supervisors mistreated her, they had no knowledge of her heart condition. With no evidence of any causal connection between the alleged discriminatory acts and her asserted disability, the claim fails.

Next, the Court turns to the claims premised on Blackmon's care for her autistic son. The Amended Complaint seems to allege that the Agency "fail[ed] to accommodate" Blackmon's need for a flexible work schedule to care for her disabled son. ECF No. 22 ¶¶ 90, 93. But as the EEOC has explained in its own interpretative guidance, an employer must provide reasonable accommodations solely to employees who suffer from disabilities. See 29 C.F.R. § 1630.8 app. at 349 (Duty to provide reasonable accommodation "only applies to qualified applicants or employees with disabilities. Thus, for example, an employee would not be entitled to a modified work schedule as an accommodation to enable the employee to care for a spouse with a disability."). Employers retain no similar obligations to accommodate the caretakers of disabled persons. *See Lee v. Safeway, Inc.*, No. RDB-13-3476, 2014 WL 4926183, at *10 (D. Md. Sept. 30, 2014); *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004) ("[T]he right to an accommodation, being limited to disabled employees, does not extend to a nondisabled associate of a disabled person."). Accordingly, as to this liability theory, the claim cannot proceed.

Blackmon also contends that the Agency discriminated against her based on her caretaker status. This cause of action, in theory, is available to Blackmon. The Rehabilitation Act squarely prohibits "excluding or otherwise denying equal jobs or benefits to a qualified

17

individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  42 U.S.C. § 12112(b)(4); *see also Tyndall v. Nat'l Educ. Centers, Inc. of Cal.*, 31 F.3d 209, 214 (4th Cir. 1994).  The Agency knew that Blackmon was the primary caregiver for her clearly disabled son, and that Blackmon had made certain requests at work to facilitate that role.  ECF No. 27-2 at 6–7; 42 U.S.C. §§ 12102 (defining disability as "a physical or mental impairment that substantially limits one or more major life activities").

That said, because Blackmon's disability discrimination claim also rests on the denial of telework as the "adverse employment action," the claim fails for similar reasons as her Title VII claims.  Nor, as with her Title VII claims, has Blackmon pointed to any similarly situated comparators with a different disability status who received more favorable treatment than her.  And Blackmon has not generated any evidence that the Agency's stated reasons for its actions were a mere pretext for discriminating against Blackmon because she cared for her son.  Accordingly, summary judgment is granted to the Agency on this claim too.

### D.  Rehabilitation Act Retaliation

Blackmon next alleges that the Agency unlawfully retaliated against her for requesting telework and a flexible schedule to care for her son, in violation of the Rehabilitation Act.  ECF No. 22 ¶¶ 99–100.[5]  To survive summary judgment, the employee must generate some evidence that she had engaged in activity protected under the Rehabilitation Act and that, as a result, the employer took adverse action against her.  *See S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty.*,

---

[5] In her reply, Blackmon asserts that she also alleged a Title VII retaliation claim.  ECF No. 27-1 at 20.  But the retaliation claim in the Amended Complaint clearly is framed around the "protected activity" of requesting an accommodation, an activity protected under the Rehabilitation Act.  Even if Blackmon had alleged a Title VII retaliation claim, it would fail because there is no evidence Blackmon engaged in any Title VII protected activities prior to any of the alleged adverse actions, as she did not complain to the EEOC until January 28.  Moreover, as with her Rehabilitation Act claim, it would fail because there is no evidence that she suffered any adverse actions.

819 F.3d 69, 78 (4th Cir. 2016); *Rhoads v. F.D.I.C.*, 257 F.3d 373, 392 (4th Cir. 2001).  If the

plaintiff makes this prima facie showing, the burden then shifts to the employer to articulate a

non-retaliatory reason for the adverse action, and then back to the plaintiff to demonstrate the

reason was pretextual.  *S.B. ex rel. A.L.*, 819 F.3d at 78.

   An adverse action in the retaliation context amounts to anything that "might have

dissuaded a reasonable worker" from engaging in protected activity.  *Brady v. Bd. of Educ. of*

*Prince George's Cnty.*, 222 F. Supp. 3d 459, 474 (D. Md. 2016) (quoting *Burlington N. & Santa*

*Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  Critically, where, as here, a plaintiff points to an

accommodation request as the protected activity,[6] the denial of that request cannot serve as the

adverse action for the purposes of a retaliation claim.  Otherwise, "every time an employee was

denied a requested accommodation, he would be able to 'double dip' by asserting both the ADA

failure-to-accommodate and ADA retaliation claims."  *Johnson v. Md. Transit Admin.*, No. CCB-

19-2523, 2021 WL 809768, at *5 (D. Md. Mar. 2, 2021) (quoting *McClain v. Tenax Corp.*, 304

F. Supp. 3d 1195, 1206 (S.D. Ala. 2018)); *see also Floyd v. Lee*, 968 F. Supp. 2d 308, 334

(D.D.C. 2013).

   Although difficult to parse, Blackmon seems to suggest that because she requested

regular telework and a flexible schedule, the Agency made Blackmon's working conditions

"intolerable" in retaliation.  ECF No. 22 ¶¶ 102–03.  Again, construing the record most favorably

to Blackmon, no reasonable employee in her shoes would be chilled from protected activity

---

[6] Because Blackmon fails to establish other elements of the prima facie case, the Court need not decide whether
Blackmon's request for an accommodation constitutes a protected activity.  Although accommodation requests are
generally protected activities under the Rehabilitation Act, *see Jacobs v. N.C. Admin. Off. of the Cts.*, 780 F.3d 562,
577 (4th Cir. 2015), Blackmon was not entitled to such an accommodation based on her caregiver status, *see supra*
Section III.C.  However, some courts have considered accommodation requests to be protected activities for the
purposes of retaliation claims even where the plaintiff was not actually entitled to such an accommodation, provided
that the plaintiff requested the accommodation in good faith.  *See, e.g.*, *Okyere v. John Bean Techs. Corp.*, No. 20-
190-FL, 2020 WL 7625237, at *9–10 (E.D.N.C. Dec. 22, 2020) (collecting cases).

because the employee did not receive a welcome party, was told to wear a suit to a meeting, or was not given feedback about job performance.  *Cf. Wonasue*, 984 F. Supp. 2d at 492.

Perhaps the Agency's denial of Blackmon's single training request comes closest. However, even that was not sufficiently adverse in that Blackmon suffered no professional harm as a result.  *See Maine v. Azar*, No. GLR-16-3788, 2021 WL 3617215, at *17 (D. Md. Aug. 16, 2021) (Denial of training request "may form the basis of a retaliation claim where there is evidence that the training was required for the employee's professional development or that the employee was harmed by the denial.").  Indeed, Wesley had assured Blackmon that similar training opportunities would be available after she had spent more time at the Agency, but Blackmon resigned before that day could come.  ECF Nos. 24-2 at 27; 27-2 at 109.  Thus, no reasonable juror could conclude the Agency retaliated against Blackmon because they knew she was her son's caretaker.  Summary judgment is granted to the Agency on this claim as well.

### E.  Hostile Work Environment

Blackmon lastly alleges that the Agency harassed her based on her race, sex, color, and disability and thereby subjected her to a hostile work environment under both Title VII and the Rehabilitation Act.  ECF No. 22 ¶¶ 107–12.  A hostile work environment claim survives summary judgment where plaintiff adduces some evidence that the conduct 1) was unwelcome; 2) resulted from plaintiff's protected characteristic; 3) was sufficiently severe or pervasive to alter the conditions of her employment; and 4) was imputable to her employer.  *Pueschel v. Peters*, 577 F.3d 558, 564–65 (4th Cir. 2009).  To constitute severe and pervasive harassment, the "harassing conduct must be so extreme as to amount to a change in the terms and conditions of employment."  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)) (internal quotations and bracket

omitted).  Barring extraordinary circumstances, "simple teasing, offhand comments, and isolated incidents" do not amount to workplace harassment.  *Id.*

When viewing the whole of the record most favorably to Blackmon, she experienced none of the "physically threatening" or "humiliating" conduct necessary to support this claim. *Ward v. Acme Paper & Supply Co.*, 751 F. Supp. 2d 801, 806 (D. Md. 2010).  No evidence supports that Blackmon's working environment had been "permeated with discriminatory intimidation, ridicule, and insult."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993); *cf. McLaurin v. Verizon Md., Inc.*, JKB-14-4053, 2015 WL 5081622, at *4 (D. Md. Aug. 26, 2015) (Plaintiff's hostile work environment claim failed despite allegations that one co-worker called the plaintiff a "bitch," another co-worker "urinated in front of her," and a supervisor "cursed" at her); *Butts v. Encore Mktg. Int'l*, No. PJM-10-3244, 2012 WL 3257595, at *4 (D. Md. Aug. 7, 2012) (dismissing hostile work environment claim where plaintiff's boss pressured him for sex at a work party and demeaned him in front of peers in the office).  Mere disagreeable, rude, or even hurtful slights such as forgotten celebrations and ham-fisted references to "diversity" simply do not constitute severe and pervasive disability-, race- or sex-based harassment.  Thus, viewing the evidence most favorably to Blackmon, summary judgment must be granted to the Agency.[7]

## IV.   Conclusion

For the foregoing reasons, the Court grants the Agency's motion for summary judgment. A separate Order follows.

9/7/2023                                                          /S/
Date                                                    Paula Xinis
                                                        United States District Judge

---

[7] Although Blackmon does not formally set out a separate claim for constructive discharge, to the extent that she intended to allege one, *see* ECF No. 22 ¶ 38, it fails because "the plaintiff must show 'something more' than the showing required for a hostile work environment claim."  *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (quoting *Penn State Police v. Suders*, 542 U.S. 129, 147 (2004)).